*This opinion is subject to revision before final publication in the Pacific Reporter*

**2017 UT 41**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

GARFIELD COUNTY, KANE COUNTY,
and
STATE OF UTAH,
*Appellants,*

*v.*

UNITED STATES OF AMERICA
and
SOUTHERN UTAH WILDERNESS ALLIANCE,
*Appellees.*

No. 20150335
Filed July 26, 2017

On Certification from the
United States District Court for the District of Utah

The Honorable David Nuffer,
Clark Waddoups, and Robert J. Shelby
Case Nos. 2:11-cv-1045 and
2:10-cv-1073

Attorneys:

Sean D. Reyes, Att'y Gen., Tyler R. Green, Solic. Gen.,
Anthony L. Rampton, Kathy A.F. Davis, Michael S. Johnson,
T. Parker Douglas, John Robinson Jr., Asst. Atty's Gen.,
Salt Lake City, for appellants Garfield County and State of Utah

Shawn T. Welch, Richard D. Flint, Ryan R. Jibson,
Salt Lake City, Robert C. Van Dyke, Kanab,
for appellant Kane County

John W. Huber, U.S. Att'y, John K. Mangum, Asst. U.S. Att'y,
Salt Lake City, John C. Cruden, Asst. Att'y Gen., Joseph Hosu Kim,
Joanna K. Brinkman, David C. Shilton, Washington, D.C.,
for appellee United States of America

Brent V. Manning, Alan C. Bradshaw, Jess M. Krannich, Mitchell M. Longson, Salt Lake City, Jeffrey M. Gould, Washington, D.C., Brett De Jarnette, John C. Dwyer, Heather Dunn Navarro, Palo Alto, CA, Robert B. Wiygul, Ocean Springs, MS, Stephen H.M. Bloch, Joseph J. Bushyhead, Salt Lake City, for appellee Southern Utah Wilderness Alliance

Troy L. Booher, Clemens A. Landau, Salt Lake City, for amici Taxpayer Association of Kane County, Ron Smith, and Jana Smith

Hillary M. Hoffmann, South Royalton, VT, for amicus Natural Resources and Property Law Professors

Heidi J. McIntosh, Denver, CO, for amicus Coalition to Protect America's National Parks and Park Rangers for Our Lands

---

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which JUSTICE DURHAM and JUSTICE HIMONAS joined.

JUDGE VOROS filed a dissenting opinion, in which JUDGE TOOMEY joined.

Having recused themselves, ASSOCIATE CHIEF JUSTICE LEE and JUSTICE PEARCE did not participate herein. COURT OF APPEALS JUDGES J. FREDERIC VOROS and KATE A. TOOMEY sat.

---

CHIEF JUSTICE DURRANT, opinion of the Court:

**Introduction**

¶ 1　This certified question emerges from a number of cases pending before several federal district courts concerning ownership of certain rights of way claimed by the State of Utah and several of its counties pursuant to Revised Statute 2477. The federal courts ask that we determine whether Utah Code section 78B-2-201(1) and its predecessor are statutes of limitations or statutes of repose. We hold that the plain language of both versions of the statute reveals them to be statutes of repose.[1] The application of this interpretation to the State's R.S. 2477 rights of way leads to the result that the State effectively and inevitably lost title to any such rights of way after

---

[1] There are three potentially relevant versions of the statute: the 2015 version, the 2008 version, and the pre-2008 version. As we discuss below, the two versions we are called to interpret today are the 2008 and pre-2008 versions—the two versions that existed prior to the legislature's most recent amendments.

seven years without any opportunity to prevent such loss. This result—the automatic expiration of the State's title to R.S. 2477 rights of way—is absurd and could not have been intended by the legislature, given that for most of R.S. 2477's history, no cause of action existed in the law to protect rights granted under R.S. 2477, and even after a cause of action was statutorily created, it was wholly contingent on the federal government's decision to dispute a claimed right of way. Because of the absurdity that results from applying section 201 and its predecessor as statutes of repose in this context, we construe these statutes as statutes of limitations with respect to R.S. 2477 right of way claims.

## Background

¶ 2 This case concerns the interrelationship of four separate statutes: Revised Statute 2477, the Federal Land Policy and Management Act, the Quiet Title Act, and Utah Code section 78B-2-201(1). The first statute, R.S. 2477, was enacted in 1866 to facilitate access to mining deposits located under federal lands. The statute provides "[t]hat the right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted."[2] In short, R.S. 2477 is a "standing offer of a free right of way over the public domain."[3] On October 21, 1976, Congress repealed R.S. 2477 with the Federal Land Policy and Management Act (FLPMA). Accordingly, if a claimant could prove that it had "accepted" a right of way prior to the repeal date, the claimant had an established and perfected title to the right of way. Under Utah law, "[a]cceptance of an R.S. 2477 right of way . . . requires continuous public use for a period of ten years."[4]

¶ 3 Although R.S. 2477 granted title to rights of way by operation of law—no suit or other action was required to establish title—a claimant can only protect its title to the right of way by filing suit against the United States under the federal Quiet Title Act, 28

---

[2] Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253, codified at 43 U.S.C. § 932, *repealed by* Federal Land Policy & Management Act of 1976, Pub. L. No. 94-579, § 706(a), 90 Stat. 2743, 2793.

[3] *San Juan Cty. v. United States*, 754 F.3d 787, 791 (10th Cir. 2014) (citation omitted).

[4] *S. Utah Wilderness All. v. Bureau of Land Mgmt.*, 425 F.3d 735, 771 (10th Cir. 2005), *as amended on denial of reh'g* (Jan. 6, 2006).

U.S.C. section 2409a (QTA).[5] The QTA contains its own statute of limitations, providing state and county claimants twelve years to assert a claim once the cause of action has accrued.[6] Significantly, a claimant must wait until title is "disputed" before bringing a claim under the QTA.[7]

¶ 4    To protect their alleged title to certain rights of way, Kane County, Garfield County, and the State of Utah (collectively, State or State Parties) filed separate lawsuits in 2011 against the United States. In the proceedings giving rise to the certified question, Kane County, Garfield County, and the State claim 1,510 rights of way. In addition to those proceedings, the State and various counties have initiated more than 20 separate cases to perfect title to several thousand more R.S. 2477 rights of way. There are accordingly now multiple cases pending before multiple judges of the Utah federal district court regarding at least 12,000 claimed R.S. 2477 rights of way, with each right of way claim involving unique facts.[8]

¶ 5    On June 27, 2014, the Southern Utah Wilderness Alliance (SUWA), which acts as a limited permissive intervenor in the Kane County and Garfield County cases, filed a memorandum with the United States District Court in support of the United States' Motion for Partial Dismissal, arguing that Utah Code section 78B-2-201 and its predecessor are seven-year statutes of repose that began to run as

---

[5] *See Block v. N.D. ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 286 (1983) (The QTA is "the exclusive means by which adverse claimants [can] challenge the United States' title to real property.").

[6] 28 U.S.C. § 2409a(g), (i).

[7] *Id.* § 2409a(a) ("The United States may be named as a party defendant in a civil action under this section to adjudicate a *disputed title* to real property in which the United States *claims an interest* . . . ." (emphases added)); *see also Kane Cty. v. United States*, 772 F.3d 1205, 1210–11 (10th Cir. 2014) (noting that the United States must "'claim[] an interest' in the property at issue" and that "title to the property" must be "disputed" before a court has "jurisdiction over a QTA claim" (citation omitted)).

[8] As the State notes, "[t]he roads . . . vary widely in character, ranging from two-lane, fully surfaced arterial connectors to two-track access routes." The State claims that these rights of way "remain in use for many purposes, including ranching, mineral development, fishing, hunting, sightseeing, recreation, and exploring."

to each individual right of way when the State first accepted the road pursuant to R.S. 2477. Because the State could not have obtained an R.S. 2477 right of way later than October 21, 1976—the date Congress enacted the FLPMA and repealed R.S. 2477—SUWA argued that the State was required to assert claims under the QTA no later than 1983, seven years after October 21, 1976. The federal district courts decided that section 201 and its predecessor could prove dispositive in the proceedings. Consequently, they certified to us the limited legal question of whether section 78B-2-201 and its predecessor are statutes of repose or statutes of limitations within this context.

### Standard of Review

¶ 6  As noted, this case comes to us by certified question emerging from a number of proceedings before several judges of the United States District Court for the District of Utah. "A certified question from the federal district court does not present us with a decision to affirm or reverse a lower court's decision; as such, traditional standards of review do not apply."[9] Accordingly, we merely answer the question presented, leaving "resolution of the parties' competing claims and arguments . . . up to the federal courts, which of course retain jurisdiction to decide [the] case."[10] We have jurisdiction pursuant to Utah Code section 78A-3-102(1) and article VIII, section 3 of the Utah Constitution.

### Analysis

¶ 7  The certified question asks whether Utah Code section 78B-2-201(1) and its predecessor are statutes of limitations or statutes of repose. The predecessor to section 201(1), which was in effect from the time it was enacted in 1872 until 2008, provided as follows:

> [1] The state will not sue any person for or in respect to any real property, or the issues or profits thereof, by reason of the right or title of the state to the same, unless:
>
> > [a] such right or title shall have accrued within seven years before any action or other proceeding for the same shall be commenced; or

---

[9] *U.S. Fid. & Guar. Co. v. U.S. Sports Specialty Ass'n*, 2012 UT 3, ¶ 9, 270 P.3d 464 (citation omitted).

[10] *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*, 2012 UT 66, ¶ 10, 289 P.3d 502.

> [b] the state or those from whom it claims shall have received the rents and profits of such real property, or some part thereof, within seven years.[11]

The legislature amended the statute in 2008 to read:

> [1] The state may not bring an action against any person for or with respect to any real property, its issues or profits, based upon the state's right or title to the real property, unless:
>
>> [a] the right or title to the property accrued within seven years before any action or other proceeding is commenced; or
>>
>> [b] the state or those from whom it claims received all or a portion of the rents and profits from the real property within the immediately preceding seven years.[12]

The certified question asks us to interpret these two versions of the statute and determine whether they should be construed as statutes of repose or statutes of limitations.[13]

¶ 8 Although not directly addressed in the certified question, two bills passed in 2015 bear on our decision. First, the legislature again amended section 201 to add a new subsection, though it left the remainder of the statute—including the portions relevant to our discussion today—unchanged. This new subsection states that "[t]he

---

[11] UTAH CODE § 78-12-2 (2007) (alterations to numbering to reflect current numbering).

[12] *Id.* § 78B-2-201 (2009) (alterations to numbering to reflect current numbering).

[13] The Order of Certification, though issued after the legislature amended section 201 in 2015, makes clear that the federal district courts are not asking us to interpret the 2015 version of the statute, but rather the two prior iterations of the statute: the pre-2015, post-2008 version of the statute and the pre-2008 version of the statute, which was substantively unaltered from the version originally enacted in 1872. Thus, unless otherwise indicated, when we refer to section 78B-2-201, we are referring to the pre-2015, post-2008 version of the statute. And when we refer to the predecessor to section 201, we are referring to the pre-2008 version.

statute of limitations in this section runs from the date on which the state or those from whom it claims received actual notice of the facts giving rise to the action."[14] This amendment was expressly made retroactive to March 12, 1953.[15] The second bill passed in 2015 resulted in section 78B-2-118. This new statute states that "[a]ctions against the federal government regarding real property and that are subject to the federal Quiet Title Act . . . do not expire under this chapter."[16] This statute was also made retroactive to October 25, 1972.[17]

¶ 9    There are three main issues raised by the parties in response to the certified question: first, whether we should even address the certified question due to the possibility of issuing an advisory opinion; second, whether, using our normal tools of statutory interpretation, we should interpret section 78B-2-201 and its predecessor as statutes of limitations or statutes of repose; and third, if we interpret these statutes as statutes of repose, whether we should reform the statutes under our absurdity doctrine. We address each issue in turn and conclude that we should address the question on its merits, and that though the plain language of both iterations of the statute renders them statutes of repose, the result of applying such an interpretation to the State's R.S. 2477 rights of way works such an overwhelmingly absurd result that we construe the statutes as statutes of limitations as to such claims.

I. We Will Answer the Certified Question, Leaving Resolution of
How and Whether Our Interpretation Applies to the Underlying
Cases to the Federal Courts

¶ 10 Prior to interpreting section 78B-2-201 and its predecessor, we first address whether we should decline to answer the certified question. The State has advanced several reasons why our interpretation of these statutes does not apply to the underlying case: (1) the 2015 bills amending section 201 and adding section 78B-2-118

---

[14] UTAH CODE § 78B-2-201(2) (2015).

[15] See 2015 Utah Laws 2806 ("This bill has retrospective operation to March 12, 1953.").

[16] UTAH CODE § 78B-2-118.

[17] See 2015 Utah Laws 324 ("This bill has retrospective operation to October 25, 1972.").

are retroactive and control the litigation;[18] (2) section 78B-2-102 requires the courts to apply the QTA's twelve-year statute of limitations instead of the one found in section 201 and its predecessor;[19] (3) the limitation found within the statutes at issue applies only to suits by "the state" against a "person," which excludes suits by counties against the federal government;[20] and (4) article XX, section 1 of the Utah Constitution precludes the application of either of the statutes at issue.[21] Thus, according to the State, because the determination of whether section 78B-2-201 and its

---

[18] The amendment to section 201 indicates a legislative intent to clarify that the section is and was a statute of limitations. *See* UTAH CODE § 78B-2-201(2) (2015). Section 118 states that "[a]ctions against the federal government regarding real property and that are subject to the [QTA] do not expire under this chapter." *Id.* § 78B-2-118. The United States and SUWA argue that the legislature cannot properly make these amendments retroactive and that, even if it could, such retroactivity would not be constitutional under either the federal or Utah constitutions.

[19] Section 102 states that the limitation periods found in chapter 2 of title 78B apply "except in specific cases where a different limitation is prescribed by statute." Thus, the State argues that the QTA's statute of limitations trumps the Utah statute. The United States and SUWA point out that the applicability of the QTA statute of limitations does not necessarily preclude the applicability of a Utah statute of repose because it is possible to have both a federal statute of limitations and a state statute of repose apply to a particular claim. *See CTS Corp. v. Waldburger*, 134 S.Ct. 2175, 2185–88 (2014).

[20] The State argues that "state" is defined in such a way that it does not include counties. *See* UTAH CODE § 68-3-12.5(28). We have never interpreted this section, and we conclude that we need not do so here because it is unnecessary to our resolution of the question certified to us.

[21] The State points to previous cases that held that this portion of the Utah Constitution prohibited the application of section 201 or its predecessor to certain claims involving lands granted to the State in trust by the Enabling Act. *See Van Wagoner v. Whitmore*, 199 P. 670, 675 (Utah 1921). It is not clear, however, whether R.S. 2477 operates in a similar way as the Enabling Act such that the rights of way granted under that statute would become part of the public trust.

predecessor are statutes of repose or statutes of limitations will not affect the outcome of the case for some or all of these reasons, we should avoid issuing an advisory opinion and refuse to answer the certified question. The United States and SUWA challenge each of the reasons propounded by the State, arguing that none of them justifies a refusal to answer the certified question. Although it appears that the arguments raised by each of the parties have some merit, the existence of arguments about the ultimate applicability of section 201 or its predecessor to the underlying cases in light of these other statutes or constitutional provisions—and hence the applicability of our interpretation of the actual statutes at issue— does not mean that we should refuse to answer the certified question.

¶ 11 "On certification, we answer the legal questions presented *without resolving the underlying dispute*."[22] Because traditional standards of review do not apply, we are not called upon to review the federal court's conclusions of law or fact.[23] The district courts involved in these cases stated in the Order of Certification that section 78B-2-201 and its predecessor were potentially controlling and dispositive of the R.S. 2477 cases. They did so even after receiving the State's suggestion of mootness based on section 118.[24] And although it is not clear whether the federal district courts had the opportunity to address all of the arguments raised by the State, the United States, and SUWA, those courts' conclusion that these statutes could be dispositive is a legal conclusion that we are not in a position to review on certification and must accept for purposes of answering the certified question.

---

[22] *U.S. Fid. & Guar. Co. v. U.S. Sports Specialty Ass'n*, 2012 UT 3, ¶ 9, 270 P.3d 464 (emphasis added) (citation omitted).

[23] *See id.* ("A certified question from the federal district court does not present us with a decision to affirm or reverse a lower court's decision; as such, traditional standards of review do not apply." (citation omitted)); *Ray v. Wal-Mart Stores, Inc.*, 2015 UT 83, ¶¶ 63–65, 359 P.3d 614 (stating that our approach to answering a certified question requires us to "simply accept the facts the federal district court asked us to assume for purposes of certification," without attempting to "resolv[e] any underlying factual disputes").

[24] The State did not object to or otherwise attempt to modify the certification order.

¶ 12 With the exception of the question of whether the United States is a "person" for purposes of section 201 and its predecessor,[25]

---

[25] This question, unlike the other arguments raised by the State, can be fairly said to be included within the scope of the certified question, so we asked the parties to provide supplemental briefing on the question of whether the United States is a "person" for purposes of section 201 and its predecessor. We appreciate the parties' thorough briefing on this important question. That briefing demonstrates that there are persuasive arguments both for and against reading the word "person" to include the United States.

All versions of the statute provide that the State will not sue "any person" under certain circumstances. The State argues that there is a "longstanding interpretive presumption that 'person' does not include the sovereign." *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 780 (2000). So, in the State's view, section 201 and its predecessor do not apply to the United States at all. But the United States contends that the plain meaning of the word "person" includes "any property owner." It also relies on the 2010 amendments to the general definitions statute, which defines "person" broadly as including political subdivisions, government offices, "other bod[ies] of government," and "any other organization or entity." UTAH CODE § 68-3-12.5(17). SUWA argues that the pre-2010 versions of the general definitions statute are the relevant ones, and those versions define "person" to include a "body politic." In SUWA's and the United States' view, the United States is a "body politic," and thus a "person" for purposes of these statutes.

A rich body of law has grown up around how to construe the word "person" when it is employed in statute. On one hand, the United States Supreme Court has long recognized an "often-expressed understanding that 'in common usage, the term "person" does not include the sovereign, [and] statutes employing the [word] are ordinarily construed to exclude it.'" *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 64 (1989) (alterations in original) (quoting *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 667 (1979) (quoting *United States v. Cooper Corp.*, 312 U.S. 600, 604 (1941))). This principle has come to be known as the "artificial-person canon." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 273 (2012) ("The word *person* includes corporations and other entities, but not the sovereign."). But the question appears to be more nuanced than this formulation might convey. Some courts have applied a "benefit-burden" rule, such that a court will construe the word "person" to include the sovereign when it would be to the

(Continued)

sovereign's benefit, but not when it would be to the sovereign's detriment. *See* 3 NORMAN J. SINGER & J.D. SHAMBIE SINGER, SUTHERLAND ON STATUTES AND STATUTORY CONSTRUCTION § 62:2 (7th ed. 2016) ("[A] general statute which is beneficial to the sovereign will be liberally interpreted to secure for it the same rights, privileges and protection granted to individuals."); *see also Stanley v. Schwalby*, 147 U.S. 508, 519 (1893) ("Although not bound by statutes of limitation, the United States, as we have seen, were entitled to take the benefit of them . . . ."). But other courts appear not to recognize any type of benefit-burden rule and have concluded that, without express definition, the sovereign is not a "person" even where the statute would work a clear benefit to it. *See In re Fox's Will*, 52 N.Y. 530, 535 (1873) ("[N]o authority has been referred to showing that the word person, when used in a statute, may, without further definition, be held to embrace a State or nation."), *aff'd sub nom. United States v. Fox*, 94 U.S. 315 (1876).

This question is even more nuanced in Utah, given that the legislature has defined "person" in the general definitions statute. We agree with SUWA that, given that the events in this case took place before 2010, the relevant version of the definitions statute appears to be the pre-2010 versions, which define "person" to include "bodies politic." *See* Revised Statutes of Utah § 65-2-2498(5) (1898); UTAH CODE § 68-3-12(2)(o) (2004). But it is not clear whether the United States is a "body politic." Some courts have stated that a sovereign is a "body politic," but other courts have held that that term cannot be construed to encompass the sovereign. *Compare Cotton v. United States*, 52 U.S. 229, 231 (1850) ("Although as a sovereign the United States may not be sued, yet as a corporation or body politic they may bring suits to enforce their contracts and protect their property, in the State courts, or in their own tribunals administering the same laws.") *with Des Moines Cty. v. Harker*, 34 Iowa 84, 86 (1871) ("The legislature does not, when prescribing a rule for the State, call it a 'body politic and corporate.' It is not probable such a designation can be found in the entire history of our legislation."). So the pre-2010 definition of "person" does not definitively encompass the United States.

Even if we were to look to the 2010 amendments for the definition of "person," it is still not clear that that definition includes the United States. The 2010 amendments provide that "person" means, among other things, "a political subdivision; a government office, department, division, bureau, or other body of government; and any other organization or entity." UTAH CODE § 68-3-12.5(17)(i),

(Continued)

11

what the State is asking us to do in response to the certified question is to essentially ignore the specific question asked—a question of statutory interpretation—and instead address myriad questions about the future application of our interpretation. This is inappropriate.[26] Our job "is to resolve disputed questions of state law in a context and manner *useful* to the resolution of a pending federal case."[27] To be sure, we appropriately consider the specific circumstances and particular context of the underlying case when answering a certified question, which helps ensure that we are not issuing an abstract opinion on a matter of interest to the federal courts.[28] But though our answer should "facilitat[e] the disposition

---

(j), (k). Some of these terms, for example "other body of government" and "any other organization or entity," might appear broad enough to include the United States. But the canons of *ejusdem generis* and *noscitur a sociis* would suggest that these catch-alls cannot broaden the otherwise limited list, where each enumerated item is a government *subdivision*, and none is a sovereign.

Contrary to the dissent's assertion, it is not clear that the constitutional avoidance canon is sufficient to resolve this question. *Cf. infra* ¶ 79 n.90. While it is true that a state may not discriminate against the United States, it is not clear that providing a statute of repose or limitations defense to others, but not to the sovereign—who is protected from suit, in the ordinary course of events, by the doctrine of sovereign immunity—would constitute "discriminating" against the United States. For example, it could be said that it is solely by virtue of its own voluntary waiver, and not the state law, that the United States finds itself in a different position than other property owners.

Given the strength of these competing arguments, we find it sufficient to assume for purposes of this opinion that the word "person" in section 201 and its predecessor includes the United States.

[26] *See Egbert v. Nissan N. Am., Inc.*, 2007 UT 64, ¶ 20, 167 P.3d 1058 (noting that the parties disagreed about a legal issue related to but not addressed by the certified question and had "briefed [the] issue at length," but declining to address the issue "[b]ecause the question of who bears the burden of proof was not certified to us").

[27] *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*, 2012 UT 66, ¶ 8, 289 P.3d 502 (emphasis added).

[28] *Id.* ¶¶ 8–9. Indeed, as we discuss below, we interpret section 201 and its predecessor as statutes of repose in the abstract using our

(Continued)

of the underlying federal case," we have recognized "that our opinion on certification will [not] itself resolve the underlying federal case. The resolution of the parties' competing claims and arguments will be up to the federal courts, which of course retain jurisdiction to decide this case under the law as they see it."[29] Thus, although the district courts' "decision will be informed by our resolution of the state law issues presented," "[t]hose courts retain the independent authority to decide *whether and to what extent to apply our law* or to recognize limitations on or caveats to it."[30]

¶ 13 Our recognition that the federal courts retain the authority to decide "whether . . . to apply our law," especially when it intersects with federal law as it does here,[31] necessarily entails a recognition that our answer to a certified question may not always end up being dispositive. This has not prevented us from answering certified questions in the past, and it does not require us to decline to answer the question certified to us today.[32] Accordingly, we now

---

usual plain language approach to statutory interpretation. Despite this conclusion, we apply another interpretive tool, the absurdity doctrine, and conclude that the statutes are absurd as applied to the State's R.S. 2477 claims. Thus, we answer the certified question—the proper interpretation of the statute—within the context of the underlying cases. But we do not need to reach beyond section 201— beyond the scope of the certified question—to make this analysis.

[29] *Id.* ¶¶ 9–10.

[30] *Id.* ¶ 10 (emphasis added).

[31] *Id.*

[32] To be sure, we may not answer a question of state law when there is a serious question as to the jurisdiction of the federal court over the underlying case or if the question asks us to opine on a purely hypothetical situation. In either circumstance, there is a high risk of issuing an unconstitutional advisory opinion. *See, e.g., Utah Republican Party v. Cox*, 2016 UT 17, ¶¶ 8–11, 373 P.3d 1286 (per curiam) (refusing to answer a certified question because it was "purely hypothetical and not ripe for review"); *Endow v. Utah Transit Auth.*, No. 20140024-SC, 2015 WL 4394047, at *1 (Utah July 17, 2015) (revoking "our acceptance of the certified question as improvident" to avoid the possibility of issuing an advisory opinion because there were "serious jurisdictional concerns" with whether the federal district court had subject matter jurisdiction). But neither of these circumstances is before us today. The mere fact that issues of fact

(Continued)

turn to a discussion of the certified question: whether section 78B-2-201 and its predecessor are statutes of limitations or statutes of repose. And under the standard discussed above, we answer this question within the context of the particular circumstances in which the question arose—the State's claims to rights of way under R.S. 2477.

## II. The Plain Language of Both Iterations of the Statute Unmistakably Renders Them Statutes of Repose

¶ 14 The federal district courts have asked us to decide whether Utah Code section 78B-2-201 and its predecessor are statutes of limitations or statutes of repose. Section 201, prior to its amendment in 2015,[33] states in its entirety:

> [1] The state may not bring an action against any person for or with respect to any real property, its issues or profits, based upon the state's right or title to the real property, unless:
>
>> [a] the right or title to the property accrued within seven years before any action or other proceeding is commenced; or
>>
>> [b] the state or those from whom it claims received all or a portion of the rents and profits from the real property within the immediately preceding seven years.[34]

The predecessor to section 201 read as follows:

> [1] The state will not sue any person for or in respect to any real property, or the issues or profits thereof, by reason of the right or title of the state to the same, unless:

---

and law remain to be resolved that may impact the applicability of our answer to the underlying case does not warrant our refusal to answer the certified question. Otherwise we would require federal courts to exhaust every other possible dispositive argument and resolve every factual dispute before certifying a question to us. We have not required this in the past and do not do so now.

[33] As noted above, the federal courts have not asked us to interpret the post-2015 amendment version of the statute.

[34] UTAH CODE § 78B-2-201 (2009) (alteration to numbering to reflect current numbering).

> [a] such right or title shall have accrued within seven years before any action or other proceeding for the same shall be commenced; or
>
> [b] the state or those from whom it claims shall have received the rents and profits of such real property, or some part thereof, within seven years.[35]

The language found in subsection (1)(a) of both versions of the statute—"right or title . . . accrued within seven years before any action or other proceeding [is] commenced"—controls this issue. The question is whether this language means that the State cannot assert a cause of action related to real property except within the first seven years after the accrual of its right or title to the property—a statute of repose—or whether it means that the State cannot bring suit except within seven years after the accrual of a cause of action based on its right or title to the real property—a statute of limitations.

¶ 15 "When interpreting a statute, it is axiomatic that this court's primary goal 'is to give effect to the legislature's intent in light of the purpose that the statute was meant to achieve.'"[36] In discerning this purpose, "[t]he best evidence of the legislature's intent is 'the plain language of the statute itself.'"[37] In general, "[w]here a statute's language is unambiguous and provides a workable result, we need not resort to other interpretive tools, and our analysis ends."[38] After reviewing the plain language of the two relevant versions of the statute, we conclude that they unmistakably operate as statutes of repose.

¶ 16 "Whether a statute that bars or terminates a claim for relief is a statute of limitations or a statute of repose depends on the nature of the statute and the manner in which it operates to cut off the legal

---

[35] UTAH CODE § 78-12-2 (2007) (alterations to numbering to reflect current numbering). The language of this iteration of section 201 remained substantively unaltered from its enactment in 1872 until the 2008 amendments.

[36] *Biddle v. Wash. Terrace City*, 1999 UT 110, ¶ 14, 993 P.2d 875 (citation omitted).

[37] *State v. Miller*, 2008 UT 61, ¶ 18, 193 P.3d 92 (citation omitted).

[38] *Torrie v. Weber Cty.*, 2013 UT 48, ¶ 11, 309 P.3d 216 (citation omitted).

right of a person to obtain a remedy for an injury."[39] We first described the difference between the two types of statutes in *Berry ex rel. Berry v. Beech Aircraft Corp.*[40] Prior to *Berry*, we used the terms almost interchangeably, without recognizing a difference between them.[41] In *Berry*, however, we clarified that

> [a] statute of limitations requires a lawsuit to be filed within a specified period of time after a legal right has been violated or the remedy for the wrong committed is deemed waived. A statute of repose bars all actions after a specified period of time has run from the occurrence of some event other than the occurrence of an injury that gives rise to a cause of action. . . .
>
> . . . .
>
> . . . . Therefore, a statute of repose may bar the filing of a lawsuit even though the cause of action did not even arise until after it was barred and even though the injured person was diligent in seeking a judicial remedy.[42]

Accordingly, we distinguish statutes of limitations and statutes of repose by looking to the event that triggers the start of the statutory timeframe: if the trigger is the accrual of a cause of action, it is a statute of limitation, but if it is some other event, it is a statute of repose.[43]

¶ 17 Prior to 2008, the relevant language of section 201 stated that

---

[39] *Stoker v. Workers' Comp. Fund of Utah*, 889 P.2d 409, 411 (Utah 1994)

[40] 717 P.2d 670, 672 (Utah 1985).

[41] *See Sun Valley Water Beds of Utah, Inc. v. Herm Hughes & Son, Inc.*, 782 P.2d 188, 189 n.5 (Utah 1989) ("[M]any courts and commentators do not distinguish between statutes of limitations and repose.").

[42] 717 P.2d at 672.

[43] *See Sun Valley*, 782 P.2d at 189 ("A statute of limitations precludes suit a legislatively imposed number of years after the accrual of a cause of action. A statute of repose bars suit a specified number of years after the occurrence of a particular event without regard to the date of the accrual of the cause of action.").

> The state will not sue any person for or in respect to any real property . . . by reason of the right or title of the state to the same, unless . . . such right or title shall have accrued within seven years before any action or other proceeding for the same shall be commenced . . . .[44]

The 2008 amendment made only small changes. It then read as it does now:

> The state may not bring an action against any person for or with respect to any real property . . . based upon the state's right or title to the real property, unless . . . the right or title to the property accrued within seven years before any action or other proceeding is commenced . . . .[45]

Accordingly, the 2008 amendment made it clear that the "right or title" that must have "accrued within seven years before [the] action or other proceeding" was "right or title *to the property*" that was the basis for the state's claim.

¶ 18 It is clear from its language that the relevant portion of section 201—both pre- and post-2008 amendment—is a statute of repose.[46] Despite the differences in the language of the two versions of the statute, the key operative language is the same: the seven-year timeframe to assert a cause of action based on real property in each version of the statute begins to run when the State's "right or title to

---

[44] UTAH CODE § 78-12-2 (2007).

[45] *Id.* § 78B-2-201 (2009).

[46] The State claims that the 2015 amendment clarifies that the previous iterations of the statute all were intended to operate as statutes of limitations. The 2015 amendment to the statute does seem to indicate the legislative intent to transform section 201 in its entirety into a statute of limitation, and to do so retroactively. The parties have argued at some length about the retroactivity of this amendment. But given our conclusion that applying section 201 and its predecessor as statutes of repose is absurd, and that we accordingly construe the statutes as statutes of limitations with respect to the State's R.S. 2477 claims, we see no need to further inquire as to the applicability or impact of the 2015 amendment.

the property accrued."[47] Accordingly, both versions of the statute are statutes of repose because their limitation periods are not triggered by the accrual of a cause of action, as would be the case for a statute of limitations, but some other event—obtaining an interest in real property—that is not related to the time at which the State is able to assert a claim. Thus, section 201 and its predecessor are statutes of repose that cut off the State's ability to bring an action "for or with respect to any real property, . . . based upon the state's right or title to the real property, unless . . . the right or title to the property accrued within seven years before any action or other proceeding is commenced."[48]

¶ 19 The State argues that if we interpret these statutes as statutes of repose, however, it will work such absurd results when applied in the R.S. 2477 cases that we are required to apply our absurdity doctrine and reform the statutes. As we discuss below, we agree and accordingly construe section 201 and its predecessor as statutes of limitations within the context of the State's R.S. 2477 claims.

### III. We Employ the Absurdity Doctrine and Construe Section 201 and Its Predecessor as Statutes of Limitations with Respect to the State's R.S. 2477 Rights of Way

¶ 20 Although section 201 and its predecessor are by their plain language statutes of repose, the State asks us to apply the absurdity

---

[47] *Id.* § 78B-2-201(1) (2009). *Cf. id.* § 78-12-2 (2007) (limitation period of a claim "in respect to any real property" triggered when "such right or title shall have accrued"). Although the State questions what the statutes mean by referring to a "right" that accrues, it is clear from the context that they are referring to circumstances where the State obtains either title to real property— "the numerous *rights* and privileges attendant to ownership of property," the whole "bundle of sticks," *CFD Payson, LLC v. Christensen*, 2015 UT App 251, ¶ 12 n.5, 361 P.3d 145 (emphasis added) (citation omitted)—or a right in real property—something less than title, less than the collection of all of the rights one can have in real property.

[48] UTAH CODE § 78B-2-201(1) (2009). *Cf. id.* § 78-12-2 (2007) ("The state will not sue any person *for or in respect to any real property . . . by reason of the right or title of the state to the same, unless . . . such right or title shall have accrued within seven years before any action or other proceeding for the same shall be commenced . . . .*" (emphasis added)).

doctrine to construe them as statutes of limitations. The State argues that applying these statutes as statutes of repose leads to the absurd result that it "automatically lost any interest it had in R.S. 2477 rights of way by [October 21,] 1983"—the last date it could have asserted a QTA claim—"even if it could not possibly have filed suit to protect those interests before that date." In response, the United States and SUWA contend that the statutes do not lead to absurd consequences when applied to the State's right of way claims because the State could have filed suit to protect its R.S. 2477 roads before 1983, and, even if the State could not have filed such a suit, there is nothing absurd about "leaving title claims unresolved when doing so will have little to no effect on the practical day-to-day use of the roads at issue."

¶ 21 We agree with the State. Applying section 201 and its predecessor as statutes of repose would effectively deprive the State of its R.S. 2477 rights of way. As statutes of repose, the statutes would have been operating since 1872 to cut off the State's ability to protect rights of way that accrued since 1866—despite the fact that no mechanism to defend such property interests had been created judicially or legislatively until 1972. This is a result "so overwhelmingly absurd that no rational legislator could ever be deemed to have supported a literal application of [the statutes'] text."[49] Accordingly, we employ our absurdity doctrine and construe section 201 and its predecessor as statutes of limitations for purposes of the State's R.S. 2477 claims—a statutory construction that both avoids the absurd consequences at issue here and preserves the statutes as operative legislative enactments.[50]

---

[49] *Cox v. Laycock*, 2015 UT 20, ¶ 72, 345 P.3d 689 (Lee, J., concurring).

[50] We note that the State urges this court to consider the effect of section 201 and its predecessor on *all* state real property, including non-R.S. 2477 property interests. The United States and SUWA oppose this approach, averring that we must instead limit our absurdity analysis solely to the factual and legal context of this case, lest we modify the statute on the basis of a case not before us. Though we do not rely on a consideration of non-R.S. 2477 property interests in this case to conclude that the statutes work absurd results when applied to the State's rights of way, we do note that we need not wholly disregard how a statute may operate in a hypothetical legal dispute. Considering how a statute would operate on different fact patterns in diverse legal contexts can sharpen the boundary

(Continued)

¶ 22 As we concluded above, section 201 and its predecessor are by their plain language statutes of repose. Under the plain meaning rule, "where the language of a statute is clear and unambiguous, our analysis [normally] ends."[51] But "[a]n equally well-settled caveat to the plain meaning rule" is the absurdity doctrine, which "states that a court should not follow the literal language of a statute if its plain meaning works an absurd result."[52] The literal language of a statute works an absurd result when the operation of the statute is "so overwhelmingly absurd that no rational legislator could ever be deemed to have supported a literal application of its text."[53] The absurdity doctrine recognizes that although "the plain language interpretation of a statute enjoys a robust presumption in its favor, it is also true that [a legislative body] cannot, in every instance, be counted on to have said what it meant or to have meant what it said."[54]

¶ 23 "[A]s is common to all rules of statutory construction, the guiding star of the absurd[ity] doctrine is the intent of the pertinent

---

between an absurd and non-absurd application of the statute. This, in turn, may enable a court to determine whether the statute as applied to the case before it leads to an overwhelmingly absurd result. Because an application of the plain language of section 201 and its predecessor clearly lead to an absurd result in this case, we need not consider the State's hypotheticals or the Appellees' responses to those hypotheticals. We do not, however, foreclose our ability to consider hypothetical applications of a statute in some future absurdity doctrine case.

[51] *State ex rel. Z.C.*, 2007 UT 54, ¶ 11, 165 P.3d 1206.

[52] *Id.* (alteration in original) (citation omitted).

[53] *Cox*, 2015 UT 20, ¶ 72 (Lee, J., concurring) ("If we are to maintain respect for the legislature's policymaking role, and avoid the temptation to substitute our preferences for its decisions, we must not override the statutory text with our sense of good policy in a case in which we deem the statute's formulation merely unwise or incongruous.").

[54] *FBI v. Abramson*, 456 U.S. 615, 638 (1982) (O'Connor, J., dissenting) (citation omitted). Because the absurdity doctrine modifies a statute contrary to its plain meaning, it "is strong medicine" to be administered "in the rare and limited circumstance in which the terms as written would lead to an outright *absurdity*." *Cox*, 2015 UT 20, ¶ 71 (Lee, J., concurring).

legislative body, which limits the application of this canon of construction."[55] Where a statute works an absurd result, and legislative history from the pertinent legislative body shows that the absurd result was unintended,[56] the absurdity doctrine preserves legislative intent by construing the statute in a way that ensures that the statutory text does not operate in an unintended, absurd manner.[57]

---

[55] *State ex rel. Z.C.*, 2007 UT 54, ¶ 12. The bulk of the dissent's criticism of our application of the absurdity doctrine fails to account for this important limitation. Were we indeed to override the plain meaning of statutory text whenever we view it as reflecting "a bad substantive choice," *infra* ¶ 49 (citation omitted), it would be fair to raise separation of powers concerns. But because the absurdity doctrine asks whether the result mandated by a statute's plain text is so absurd that no rational legislator could *possibly* have intended it, this doctrine "functions to preserve legislative intent," rather than frustrate it. *State ex rel. Z.C.*, 2007 UT 54, ¶ 12.

[56] *State ex rel. Z.C.*, 2007 UT 54, ¶ 21 ("Although we generally do not consult legislative history where the meaning of the statute is clear, after finding that the plain meaning has been applied in an absurd manner, we seek to confirm that the absurd application was indeed unintended by the legislature.").

[57] We note that the scope of the absurdity doctrine—as we have applied it—is not limited to "scrivener's error[s]," i.e., statutes whose plain meaning would create an absurd result in all or nearly all of its applications. *Cf. infra* ¶ 47 (citation omitted). Under this doctrine as we have articulated it, the question is whether the statute creates "*an absurd result*," i.e., a result that is absurd in the particular circumstances. *See, e.g., State ex rel. Z.C.*, 2007 UT 54, ¶ 24 (concluding that it would be absurd to apply Utah's child sex abuse statute—which undoubtedly has a broad swath of non-absurd applications—"in situations where no true victim or perpetrator can be identified"); *Tschaggeny v. Milbank Ins. Co.*, 2007 UT 37, ¶ 28, 163 P.3d 615 (concluding that it would be absurd to apply a prejudgment interest statute where it would "require a defendant to pay interest on money that ha[d] already been remitted to the plaintiff"). The United States Supreme Court has applied the doctrine in a similar way. *See United States v. Kirby*, 74 U.S. (7 Wall.) 482, 485–86 (1868) (concluding that it would create an absurd result to apply a statute criminalizing "'knowing[ly] and wilfully' obstruct[ing] or retard[ing]

(Continued)

21

¶ 24 As noted above, section 201 prevents

> [t]he state [from] bring[ing] an action against any person for or with respect to any real property . . . based upon the state's right or title to the real property, unless . . . the right or title to the property accrued within seven years before any action or other proceeding is commenced[.][58]

Applied in this case, section 201 and its predecessor preclude any legal action with respect to the State's R.S. 2477 rights of way seven years after the State obtained right or title to those property interests. Because a property right that cannot be legally protected is only an ephemeral right at best,[59] these statutes effectively set an expiration date on every R.S. 2477 right of way obtained by the State at seven years from the day the State's title to the right of way was established by acceptance. Given the history of section 201, R.S. 2477, and the QTA, this absurd result could not have been intended by the legislature.

¶ 25 The Mining Act, which permitted the State to obtain title to rights of way under R.S. 2477, was enacted in 1866. The predecessor to section 201 was enacted in 1872. Prior to the enactment of the QTA in 1972, the State had no legal mechanism to protect its vested rights of way. Because the earliest the State could have raised a QTA claim was 1972, section 201 and its predecessor ensured that the only R.S. 2477 roads the State could have protected against federal intrusion under the QTA were those obtained in and after 1965—seven years before Congress enacted the QTA. Taken together, these statutes created a regime where the right to protect title to R.S. 2477 rights of way obtained prior to 1965 automatically expired with respect to the federal government before any legal mechanism (the QTA) existed that would have permitted the State to protect its vested title.

¶ 26 Thus, if the State gained a right of way in 1964, the predecessor to section 201 would by 1971 have deprived the State of

---

the passage of the mail" to a sheriff's arrest of a mail carrier who was in the process of transporting mail).

[58] UTAH CODE § 78B-2-201 (2009). As discussed, the predecessor to section 201 has the same substantive effect.

[59] *State v. Morgan*, 64 P. 356, 361 (Utah 1901) ("A right of which the possessor cannot avail himself is practically no right." (citation omitted)).

any cause of action to protect that property interest against federal usurpation, and this despite the fact that the only cause of action that could ever be asserted by the State to protect that property interest would not be statutorily created until passage of the QTA in 1972, one year later. And this pattern of accrual and automatic expiration has been ongoing since 1872. In short, this distinctive interplay between the predecessor to section 201 and R.S. 2477 prior to the passage of the QTA has rendered an unknown number of R.S. 2477 roads—gained over a 93 year period—ephemeral, leaving the State as owner in name only with no legal means to protect its property interests from the very governmental body that granted them.

¶ 27 Not only does the unique interplay between section 201 or its predecessor and R.S. 2477 during this period lead to an absurd result—the accrual of ephemeral property rights—the history of the legislation "confirm[s] that the absurd application was indeed unintended by the legislature."[60] As previously noted, the predecessor to section 201, which is a statute of repose, was first enacted before a quiet title cause of action had been created that would permit the State to protect its R.S. 2477 roads against the federal government. The legislature simply could not have rationally intended to cut off the State's ability to protect its rights of way decades before any cause of action existed in the law to protect those interests from federal intrusion. Although it is not absurd for a statute of repose to cut off a cause of action that has not yet accrued,[61] a legislature could not intend the overwhelming absurdity of a statute of repose that cuts off a cause of action that has not yet been created either judicially or by statute as a legal remedy.

¶ 28 The absurd result created by application of section 201 and its predecessor to roads before 1965 is not ameliorated by the passage of the QTA. Even though the enactment of the QTA in 1972 established a legal remedy that would permit the State to protect its property rights from federal intrusion, section 201 and its predecessor—when interpreted as statutes of repose—render that remedy largely illusory. Before the State can bring a QTA cause of

---

[60] *State ex rel. Z.C.*, 2007 UT 54, ¶ 21.

[61] *See, e.g., Berry ex rel. Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 672 (Utah 1985) ("[A] statute of repose may bar the filing of a lawsuit even though the cause of action did not even arise until after it was barred and even though the injured person was diligent in seeking a judicial remedy.").

action against the United States, it must show that the federal courts have jurisdiction over the suit, which requires the federal government to dispute the State's title to the property.[62] This gives the federal government full control over the timing of litigation under the QTA because it can choose when to dispute title and thus choose when a QTA cause of action will accrue. Accordingly, it can merely delay any dispute over the State's R.S. 2477 roads until the statutes' seven-year limitation period has lapsed—again, effectively depriving the State of its property interests. Indeed, Kane County (a plaintiff in this case) recently had its QTA claims for certain R.S. 2477 rights of way dismissed by the Tenth Circuit because the United States had not yet disputed the State's title.[63] This means that over thirty years after section 201 or its predecessor cut off the State's ability to defend all R.S. 2477 property interests, Kane County still could not assert a QTA claim in federal court.[64] Thus, even with the passage of the QTA, which created a cause of action to protect title to R.S. 2477 rights of way, the idiosyncratic relationship between section 201 and its predecessor, R.S. 2477, and the QTA generates an overwhelmingly absurd result. In summary, when section 201 and its predecessor are applied as statutes of repose to the State's R.S. 2477 rights of way, the State automatically lost its right to protect such rights of way obtained prior to 1965 seven years after those rights of way accrued. And even with passage of the QTA in 1972, the State's ability to secure its property interests is wholly contingent on the federal government's decision to dispute the State's title—a

---

[62] *See Kane Cty. v. United States*, 772 F.3d 1205, 1210–11 (10th Cir. 2014) ("[F]or a court to have jurisdiction over a QTA claim, the plaintiff must establish that: (1) the United States 'claims an interest' in the property at issue; and (2) title to the property is '*disputed*.'" (emphasis added) (citation omitted)).

[63] *Id.* at 1213.

[64] Any right of way under R.S. 2477 had to be established by 1976, the year the statute was repealed. Thus, assuming that the State Parties perfected title to all of their rights of way immediately prior to the statute's repeal, under the United States' view of section 201 and its predecessor, the State Parties were permitted to bring suit to protect their interests for only the next seven years, until 1983. Thus, though Kane County's property right accrued at the latest by 1976, the United States argues it was prohibited from bringing suit after 1983—despite the fact that Kane County still had no effective legal mechanism it could use to protect that right even in 2014.

dispute that the United States may well elect to raise only after the seven-year period prescribed by section 201 and its predecessor. The State's inability to protect the property interests granted to it by the federal government has, in turn, rendered the State's R.S. 2477 rights of way inherently ephemeral with respect to the United States; for a property interest that gives its possessor no defensible rights against an adverse party is a property interest in name only.[65] To be sure, statutes of repose often cut off a particular cause of action before it accrues—a non-absurd result. But for most of section 201's history, it operated to cut off a cause of action that had not yet been judicially or legislatively created—a patently absurd result. Ultimately, section 201 and its predecessor go beyond simply prohibiting a cause of action to effectively placing a seven-year lifespan on the State's R.S. 2477 property interests. This is an overwhelmingly absurd result that could not have been intended by the legislative body that originally enacted the predecessor to section 201.

¶ 29 The dissent, the United States, and SUWA resist this conclusion with several arguments. The dissent first argues that the absurd result identified by the majority—"that Utah would enjoy rights of way granted by the United States without a judicial remedy for quieting title to them against the United States"—"was the prevailing law nationwide for 106 years, from the passage of the Mining Act in 1866 until the passage of the Quiet Title Act in 1972."[66] The dissent further argues that, "[i]f that rule of law in fact mandated absurd results, surely in 106 years some court somewhere would have noticed."[67]

¶ 30 This argument fails for two reasons. First, the dissent is mistaken to suggest that, because a law has been in effect for some time, it is immune from an absurdity analysis. We commonly apply the absurdity doctrine to statutes that have been on the books for decades.[68] And the dissent fails to recognize the obvious explanation for why we have not previously reached the conclusion that we

---

[65] *Jeffs v. Stubbs*, 970 P.2d 1234, 1241–42 (Utah 1998) ("[O]wnership is a collection of rights to possess, to use and to enjoy property, including the right to sell and transmit it . . . ." (second alteration in original) (citation omitted)).

[66] *Infra* ¶ 39.

[67] *Infra* ¶ 40.

[68] *See Tschaggeny*, 2007 UT 37, ¶ 28 (applying the absurdity doctrine in 2007 to a statute originally enacted in 1975).

reach today: that the question before us—whether section 201 and its predecessor create an absurd result as applied to the State's R.S. 2477 rights of way—is one of first impression for this court. At no time in these statutes' history has a party presented a legal vehicle for answering this question. And as we have explained above, a plaintiff's ability to bring a valid suit under the QTA hinges on the United States' decision to dispute title to real property, something that the United States may choose to refrain from doing for years or decades.[69] So the passage of time fails to support the dissent's argument.

¶ 31 Second, and more fundamentally, the dissent's argument fails to accurately describe the absurd result identified above. The result created by section 201 is not merely that there was no "judicial remedy for quieting title" to the State's R.S. 2477 roads. As the dissent correctly observes, even without section 201, the State could not have sued the federal government to defend such property interests until passage of the QTA in 1972. And if this were the result at issue, we would be inclined to agree with the dissent that it is not absurd.

¶ 32 The absurd result is instead that section 201 places a seven-year expiration date on the State's R.S. 2477 property, independent of whether the State could have sued the federal government. Applied according to its plain language, section 201 would reflect a legislative policy that the state can own such property only for seven years. This is an overwhelmingly absurd result. And it is one that the legislature could not have intended because, as noted above, in 1872 when section 201 was first enacted, no cause of action existed against the federal government with respect to R.S. 2477 rights of way. Section 201, therefore, operates in concert with the Mining Act and the QTA to create a pattern of automatic expiration of title to a right of way seven years after its creation—a result the legislature could not have intended.[70]

---

[69] *See supra* ¶ 28.

[70] The dissent "cannot see how a non-absurd result mandated by federal law has become absurd when mandated by state law." *Infra* ¶ 54. But this reasoning fails to appreciate "the pertinent legislative body" whose intent we must ascertain. *State ex rel. Z.C.*, 2007 UT 54, ¶ 12. It may be perfectly rational for the United States Congress to choose not to waive its sovereign immunity. But it is completely nonsensical for the Utah legislature to enact a statute cutting off its

(Continued)

¶ 33 Next, the United States and SUWA contend that applying section 201 and its predecessor as statutes of repose is not absurd because "counties and the State have alternatives to title suits for solving [land management] problems, such as applying for rights-of-way under FLPMA Title V[, 43 U.S.C. §§ 1761–1771]."[71] The United States finds this significant, arguing that our opinion in *Marion Energy, Inc. v. KFJ Ranch Partnership*[72] stands for the proposition that "[a] plain language interpretation of a statute will not be found to create an absurd result where . . . plaintiffs have 'alternative avenues' of relief."[73]

¶ 34 This argument is unpersuasive. In *Marion Energy*, we decided that a Utah State agency, in coordination with a private corporation, could not condemn a right of way to certain oil and gas deposits under the relevant eminent domain statute, and concluded that because the corporation had "alternative avenues of access to its leased mineral rights," our interpretation of the eminent domain statute was not absurd.[74] In other words, we "strictly construed"

---

ability to own these valuable R.S. 2477 rights of way after seven years.

The dissent further argues that "[t]he absurdity doctrine does not authorize us to reject the clear meaning of an unambiguous statute merely because that statute prescribes a result that seems to disfavor the State." *Infra* ¶ 54. Quite right. We agree completely with that statement, but as we explain, section 201 and its predecessor do a great deal more than merely "disfavor the State." We agree with the dissent that "[a] result is not absurd merely because reasonable people viewing a statute with the benefit of hindsight would conclude that the Legislature acted improvidently." *Infra* ¶ 55 (citation omitted). But here, we conclude not that the legislature "acted improvidently" in passing section 201 and its predecessors, but instead conclude that no rational legislator could have intended these statutes to operate as statutes of repose under the circumstances of this case.

[71] The dissent also raises this argument. *See infra* ¶¶ 57–64. And we find it unpersuasive for the same reasons we now articulate.

[72] 2011 UT 50, 267 P.3d 863.

[73] Quoting *id.* ¶ 30.

[74] *Id.* ¶¶ 1, 30.

"any ambiguity in statutory language purporting to grant the power of eminent domain" "in favor of the property owner."[75]

¶ 35 Here, the State does not seek to obtain rights of way by a statute that is strictly construed against them—rights of way it could obtain elsewhere. Instead, it seeks to defend the rights it already possesses in certain R.S. 2477 roads. Title V of FLPMA simply does not grant the State any means of defending those rights. As noted by amicus Coalition to Protect America's National Parks, that statute "authorizes the Secretaries of Interior and Agriculture to grant rights-of-way over federal lands for a wide variety of uses and purposes . . . . subject to various terms and conditions." We fail to see how a statute that allows a federal official to grant new rights of way provides a remedy to protect the disputed rights of way currently under State ownership. Section 201 and its predecessor work an absurd result when applied to the State's R.S. 2477 roads, and the United States' arguments to the contrary are unavailing.

¶ 36 Finally, the United States and SUWA argue that "there is nothing absurd about leaving title claims unresolved when doing so will have little to no effect on the practical day-to-day use of the roads at issue."[76] This argument is inapposite and assumes that the United States will never in the future act in any way inconsistent with the claimed rights of way—an assumption that strains credibility. If the United States, through its agencies, decides to prevent ingress to and egress from these rights of way, section 201 and its predecessor, applied as statutes of repose, deprive the State of any legal mechanism to obtain an adequate remedy. The United States' discretion is a flimsy shield indeed to protect the State's lawfully obtained rights of way.

¶ 37 Because the absurd consequence at issue in this case was unintended by the legislature, we apply our absurdity doctrine. In

---

[75] *Id.* ¶ 16.

[76] The United States supports this argument by citing *Block v. North Dakota ex rel. Board of University and School Lands*, where the Supreme Court left North Dakota's title to certain real property "unresolved" under the QTA. 461 U.S. 273, 291 (1983). The facts of that case simply have no bearing on our absurdity analysis. Section 201 and its predecessor do not merely leave title "unresolved" under the QTA. They foreclose any means of defending the rights the State does hold in R.S. 2477 roads. Thus, *Block* cannot guide our analysis here.

order to avoid the absurd result created by the relationship between section 201, R.S. 2477, and the QTA, we construe section 201 and its predecessor as statutes of limitations with respect to the State's R.S. 2477 rights of way.[77] Read as statutes of limitations for such cases, the State has seven years to bring its QTA cause of action from the date the federal government begins to dispute an R.S. 2477 right of way—the date the State's cause of action under the QTA accrues.[78] This avoids the absurdity at issue in this case. As for non-R.S. 2477

---

[77] We note that our decision to construe these statutes as statutes of limitations accords with legal authorities interpreting similar statutes around the time the predecessor to section 201 was enacted. In *People v. Arnold*, the New York Court of Appeals interpreted New York's *Nullum Tempus* Act, under which

> [t]he people of [New York] have agreed that they will not sue, or implead any person, for or in respect to any lands, by reason of any right or title of the people to the same, which shall not have accrued within the space of forty years before suit for the same be commenced, unless the people, or those under whom they claim, shall have received the rents and profits thereof within the said space of forty years.

4 N.Y. 508, 510 (1851). This statute "was taken from the English *nullum tempus* act," which placed a time limit on the king's ability to eject private parties from crown lands. *Id.* at 511–12. The New York Court of Appeals interpreted this statute not as one of repose, but as a statute of limitation, establishing the condition under which a private party could obtain title to state land by adverse possession. The fact that courts interpreted similar statutes around the time of enactment of section 201's predecessor to be statutes of limitations further enhances our conclusion that the legislature did not intend for section 201 to operate as a statute of repose to cut off the State's R.S. 2477 rights of way.

[78] *Valley Colour, Inc. v. Beuchert Builders, Inc.*, 944 P.2d 361, 364 (Utah 1997) ("[A] cause of action accrues 'upon the happening of the last event necessary to complete the cause of action.'" (citation omitted)).

state property, we note that section 201 and its predecessor's application to such interests is not before us. Our absurdity doctrine should be cabined to concrete, active legal disputes. Accordingly, we leave it to a future case to decide whether these statutes give rise to absurd consequences when applied to non-R.S. 2477 state property interests.

## Conclusion

¶ 38 Despite the many claims raised by the State as to why our answer to the certified question could be advisory, we leave to the federal courts the resolution of the application of our interpretation of section 78B-2-201 and its predecessor to the underlying cases. Addressing the question on its merits, we conclude that section 201 and its predecessor are, by their plain language, statutes of repose. But applying these statutes as such to the State's R.S. 2477 claims leads to an overwhelmingly absurd result not intended by the legislature. Thus, we answer the certified question as follows: section 201 and its predecessor are statutes of limitations when applied to the State's R.S. 2477 rights of way.

————————

JUDGE VOROS, dissenting:

¶ 39 I respectfully dissent. The majority opinion employs the absurdity doctrine to override the plain meaning of section 201 on the ground that it would yield a result so overwhelmingly absurd that no rational legislator could have intended it. But the claimed absurd result—that Utah would enjoy rights of way granted by the United States without a judicial remedy for quieting title to them against the United States—was the prevailing law nationwide for 106 years, from the passage of the Mining Act in 1866 until the passage of the Quiet Title Act in 1972.

¶ 40 For this reason, I believe the majority opinion represents the most expansive application of the absurdity doctrine in American law. I am unaware of the absurdity doctrine ever being employed, in Utah or elsewhere, to reject as absurd not a *proposed* rule of law, but a *long-existing* rule of law—in this case, a rule of law governing all American states and territories for over a century. If that rule of law in fact mandated absurd results, surely in 106 years some court somewhere would have noticed. Yet no party cites, nor am I able to discover, any court questioning the rationality of the rule of law that we today declare absurd.

¶ 41 That said, I agree with much of the majority opinion. I agree with Part I insofar as it concludes that questions concerning the Quiet Title Act's twelve-year statute of limitations and the applicability of article XX of the Utah Constitution exceed the scope of the certified question. And I agree with the majority's conclusion in Part II that the plain language of section 201 and its predecessor unmistakably renders them statutes of repose.[79]

¶ 42 The federal courts have requested that we determine whether Utah Code section 78B-2-201(1) and its predecessor are statutes of limitations or statutes of repose. I would answer categorically that they are statutes of repose.[80]

---

[79] Like the majority opinion, unless otherwise indicated, I refer to the pre-2015, post-2008 version of the statute as section 201 and to the pre-2008 version of the statute as the predecessor to section 201. *Supra* ¶ 7 n.13. In addition, I refer to the 1872 version of the statute as the original predecessor to section 201.

[80] Like the majority opinion, I "answer this question within the context of the particular circumstances in which the question arose — the State's claims to rights of way under R.S. 2477." *See supra* ¶ 13.

Because the majority opinion concludes that application of the statute according to its plain language would work an absurd result in the case before us, it has no need to consider hypothetical applications of the statute. *See supra* ¶ 21 n.50.

I likewise do not consider hypothetical applications of section 201, but for a different reason. I follow the approach this court took in *State ex rel. Z.C.*, 2007 UT 54, 165 P.3d 1206. There, we analyzed the absurd result question "in the context of the law actually applied and the act with which the State chose to charge Z.C., not the law that might have been applied or the act with which the State could have charged Z.C." *Id.* ¶ 17 n.6. And we concluded that "applying the plain language of the statute *in this case* produces an absurd result." *Id.* ¶ 17 (emphasis added). For reasons explained in this opinion, and others both historical and legal, an R.S. 2477 quiet title claim against the federal government is *sui generis*. I therefore express no opinion as to whether any application of the plain language of section 201 other than the case before us would work an absurd result.

Judge Voros, dissenting

## I. The Result Mandated by Section 201 and its Predecessor Is Not Absurd or Even Uncommon

### A. The Absurdity Doctrine Is "Strong Medicine."

¶ 43 The absurdity principle has two branches. "We apply the absurd consequences canon to resolve ambiguities in a statute. If statutory language lends itself to two alternative readings, we choose the reading that avoids absurd consequences." *Utley v. Mill Man Steel, Inc.*, 2015 UT 75, ¶ 46, 357 P.3d 992 (Durrant, C.J., concurring in part and dissenting in part) (footnote omitted). "The absurdity doctrine, by contrast, has nothing to do with resolving ambiguities. Rather, we apply this canon to reform unambiguous statutory language where applying the plain language leads to results so overwhelmingly absurd no rational legislator could have intended them." *Id.* (Durrant, C.J., concurring in part and dissenting in part). Invocation of the absurdity doctrine is a "far more momentous step" than invocation of the absurd consequences canon. *Id.* ¶ 47 (Durrant, C.J., concurring in part and dissenting in part).

¶ 44 The absurdity doctrine serves as a crucial safety valve in our system of justice. Nevertheless, it "is a drastic step, one we have described as 'strong medicine, not to be administered lightly.'" *Id.* ¶ 48 (Durrant, C.J., concurring in part and dissenting in part) (citation omitted). Because the text of an unambiguous statute "is almost always irrefutable evidence of the legislature's intent," we will override the plain language under the absurdity doctrine only where the result it mandates is "so overwhelmingly absurd that no rational legislator could have intended the statute to operate in such a manner." *Id.* (Durrant, C.J., concurring in part and dissenting in part).

¶ 45 "In defining the parameters of what constitutes an absurd result," we have "note[d] the inherent tension in this canon of construction between refraining from blind obedience to the letter of the law that leads to patently absurd ends and avoiding an improper usurpation of legislative power through judicial second guessing of the wisdom of a legislative act." *State ex rel. Z.C.*, 2007 UT 54, ¶ 12, 165 P.3d 1206. "Thus, as is common to all rules of statutory construction, the guiding star of the absurd results doctrine is the intent of the pertinent legislative body, which limits the application of this canon of construction. Rather than controverting legislative power, the absurd results doctrine functions to preserve legislative intent when it is narrowly applied." *Id.*

¶ 46 However, the doctrine is virtually standardless. "Other than the directive that a result must be so absurd that the legislative body

which authored the legislation could not have intended it, there is no precise legal standard to determine what legislatures would consider to be an absurd result." *Id.* ¶ 13 (citing Veronica M. Dougherty, *Absurdity and the Limits of Literalism: Defining the Absurd Result Principle in Statutory Interpretation*, 44 AM. U. L. REV. 127, 128 (1994)). Frequently the determination of absurdity "requires a further reference to a variety of underlying values that are deeply embedded in our legal system and in our culture," Dougherty, *supra* ¶ 46 at 164–65, or, otherwise stated, "an ill-defined set of background social values identified on an ad hoc basis by the Court," John F. Manning, *The Absurdity Doctrine*, 116 HARV. L. REV. 2387, 2486 (2003). Accordingly, "the difficulty of defining absurdity, and the historical lack of attempts to do so, can . . . be explained in part by the fact that the principle represents a collection of values that are fundamental to our legal system, yet seldom made explicit in the course of the principle's application." Dougherty, *supra* ¶ 46, at 165.

¶ 47 A relatively non-controversial use of the absurdity doctrine is to correct obvious linguistic errors.

> Take the scrivener's error. Sometimes a statute will misspell "third party" as "third partly." Or provide that the "winning party" rather than the "losing party" must pay the other side's reasonable attorney's fees. In cases like these, the error in the statute is so "unthinkable" that any reasonable reader would know immediately both (1) that it contains a "technical or ministerial" mistake, and (2) the correct meaning of the text.

*Lexington Ins. Co. v. Precision Drilling Co.*, 830 F.3d 1219, 1223 (10th Cir. 2016) (Gorsuch, J., writing for himself alone in this portion of the opinion) (citing ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 235 (2012)).

¶ 48 But a more substantive use of the doctrine, though legitimate, nevertheless exists in tension with both the doctrine of separation of powers and the textualist approach to statutory interpretation. *See, e.g.*, Manning, *supra* ¶ 46 at 2391 ("The Constitution's sharp separation of lawmaking from judging reflects a rule-of-law tradition that seeks to preclude legislatures from making ad hoc exceptions to generally worded laws. By asking judges to carve out statutory exceptions on the ground that the legislature would have done so, the absurdity doctrine calls on judges to approximate the very behavior that the norm of separation seeks to forbid."); *id.* at 2392 ("Thus, for those who accept . . . the textualists' premises about the legislative process and the constitutional

structure, a principled understanding of textualism would necessarily entail abandoning the absurdity doctrine."). For example, one federal judge has argued that deploying the absurdity doctrine to overrule plain statutory text would "risk offending the separation of powers by purporting to endow a court with the power to disregard a possible statutory application not because of its linguistic implausibility but because of a judgment about the implausibility of its consequences as a matter of social policy." *Lexington Ins. Co.*, 830 F.3d at 1222 (Gorsuch, J., writing for himself alone in this portion of the opinion).

¶ 49 The absurdity that the majority sees in section 201 is not of the non-controversial, linguistic sort. Section 201 is not "linguistically incoherent." *See United States v. Head*, 552 F.3d 640, 643 (7th Cir. 2009), *superseded by statute on other grounds, as recognized by United States v. Anderson*, 583 F.3d 504 (7th Cir. 2009). Rather, in the majority's view, it "makes a bad substantive choice," *see id.*

### B. Section 201 Mandates a Rule That Prevailed Throughout the United States For Over a Century.

¶ 50 Read as written, section 201 does not work an absurd result. The majority asserts that the claimed absurd result flows from the interplay of section 201 and two federal statutes:

> Because the earliest the State could have raised a QTA claim was 1972, section 201 and its predecessor ensured that the only R.S. 2477 roads the State could have protected against federal intrusion under the QTA were those obtained in and after 1965—seven years before Congress enacted the QTA. Taken together, these statutes created a regime where the right to protect title to R.S. 2477 rights of way obtained prior to 1965 automatically expired with respect to the federal government before any legal mechanism (the QTA) existed that would have permitted the State to protect its vested title.

*Supra* ¶ 25. The interplay of these three statutes thus leaves the State holding rights of way that are "ephemeral" with respect to the federal government:

> The State's inability to protect the property interests granted to it by the federal government has, in turn, rendered the State's R.S. 2477 rights of way inherently ephemeral with respect to the United States; for a property interest that gives its possessor no defensible

> rights against an adverse party is a property interest in name only.

*Supra* ¶ 28. I agree that this result flows from the interplay of the relevant state and federal statutes. But I do not agree that this result is absurd or even uncommon.

¶ 51 On the contrary, the result section 201 mandates is and always has been the status of the R.S. 2477 rights of way at issue here. "In 1866, Congress passed an open-ended grant of 'the right of way for the construction of highways over public lands, not reserved for public uses.'" *Southern Utah Wilderness All. v. Bureau of Land Mgmt.*, 425 F.3d 735, 740 (10th Cir. 2005) (quoting Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253, codified at 43 U.S.C. § 932, *repealed by* Federal Land Policy Management Act of 1976 (FLPMA), Pub.L. No. 94-579, § 706(a), 90 Stat. 2743, 2793). "This statute, commonly called 'R.S. 2477,' remained in effect for 110 years, and most of the transportation routes of the West were established under its authority." *Id.* "Originally the doctrine of sovereign immunity barred quiet title actions against the United States." *Knapp v. United States*, 636 F.2d 279, 281 (10th Cir. 1980). "Prior to 1972, States and all others asserting title to land claimed by the United States had only limited means of obtaining a resolution of the title dispute—they could attempt to induce the United States to file a quiet title action against them, or they could petition Congress or the Executive for discretionary relief." *Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 280 (1983).[81]

¶ 52 This history makes clear that the rule of law the majority rejects as irrational and thus absurd is not novel or hypothetical. On the contrary, it has been tried and tested. Our nation lived under it

---

[81] Not until 1972 would the Quiet Title Act waive immunity with respect to claims for rights of access and rights of way. 28 U.S.C. § 2409a (2011). The Quiet Title Act permits the United States to be named as a party defendant in a civil action under the Act "to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights." *Id.* § 2409a(a). And in 1976 "Congress abandoned its prior approach to public lands and instituted a preference for retention of the lands in federal ownership, with an increased emphasis on conservation and preservation." *Southern Utah Wilderness All.*, 425 F.3d at 741. "As part of that statutory sea change, Congress repealed R.S. 2477." *Id.* "There could be no new R.S. 2477 rights of way after 1976." *Id.*

for a century—long enough, I believe, for any irrationality in the rule to emerge.

¶ 53 But the majority opinion maintains that the absurd result sought to be avoided is not that the State lacks any judicial remedy for quieting title to the State's R.S. 2477 rights of way as against the federal government; on the contrary, the majority is inclined to agree that this result is not absurd. *Supra* ¶ 31. What is overwhelmingly absurd, the majority reasons, is the fact that the State "can own such property"—R.S. 2477 roads—"only for seven years." *Supra* ¶ 32. This result, the majority maintains, is "independent of whether the State could have sued the federal government." *Supra* ¶ 32. Again, I disagree.

¶ 54 First, as I read it, section 201 says nothing about what property the State can own; like all such statutes, it addresses only when the State can bring suit. Second, for a century federal law prohibited the State from suing the federal government to quiet title to R.S. 2477 rights of way; now section 201 does. I cannot see how a non-absurd result mandated by federal law has become absurd when mandated by state law. The absurdity doctrine does not authorize us to reject the clear meaning of an unambiguous statute merely because that statute prescribes a result that seems to disfavor the State.

¶ 55 What the majority has labeled an absurd result is nothing more than a missed opportunity. The drafters of section 201 and its remote predecessors might have chosen to draft those statutes as statutes of limitation rather than statutes of repose. Had they known then what we know now—that in 1972 Congress would pass the Quiet Title Act—they may well have done so. It would have been a prescient choice. But "[a] result is not absurd merely because reasonable people viewing a statute with the benefit of hindsight would conclude that the Legislature acted improvidently." *McGhee v. Helsel*, 686 N.W.2d 6, 8 (Mich. Ct. App. 2004).

¶ 56 Finally, no formulation of the absurd results doctrine of which I am aware, in Utah or elsewhere, would allow a court to reject a non-absurd result mandated by a statute on the ground that at some time in the past that statute would have mandated an absurd result. Consequently, whatever the State could or could not have done within any seven-year repose period no longer pertains; that period has expired, leaving the State without a judicial remedy to quiet title to any R.S. 2477 roads against the federal government—leaving the State, in other words, in the same predicament it and every other state and territory was in from 1866 to 1972. Or, more

accurately, *almost* the same predicament, for the State has a remedy now that did not exist before 1972.

## C. Section 201 and Its Predecessor Do Not Leave the State Without a Remedy.

¶ 57 The majority opinion reasons that adhering to the plain language of section 201 would be absurd in part because doing so would leave the State with "no legal means to protect its property interests from the very governmental body that granted them." *Supra* ¶ 26.

¶ 58 First, based on the analysis in the preceding section, I do not agree that section 201 and its predecessor need to provide an alternative remedy to avoid absurdity. Nevertheless, a party's alternative avenues to vindicate its rights or interests do weigh in the absurdity analysis. In *Marion Energy, Inc. v. KFJ Ranch Partnership*, 2011 UT 50, ¶ 26, 267 P.3d 863, we were asked to invoke the absurd consequences canon, not the absurdity doctrine, but our reasoning there illuminates the question before us here. In *Marion Energy*, an energy company sought to condemn private land for the purpose of building a road to access its leased oil and gas deposits. *Id.* ¶ 1. It relied on a statute that granted the right of eminent domain for the building of roads to access "mineral deposits." *Id.* (citation omitted). The question before us was whether the statutory phrase "mineral deposits" encompassed oil and gas deposits. *Id.* ¶ 13. The energy company argued that to read the phrase narrowly would work an absurd result, namely, allowing one private landowner to effectively prevent the School and Institutional Trust Lands Administration "from accessing and exploiting its oil and gas deposits for the benefit of the Trust." *Id.* ¶ 27 (citation omitted).

¶ 59 We held that the statutory phrase "mineral deposits" did not encompass oil and gas deposits. *Id.* ¶ 31. We reasoned that while a narrow interpretation of the statutory phrase would deprive the energy company of one means of accessing its leased oil and gas deposits—condemnation—the company had other available means of accessing and exploiting them. *Id.* ¶ 28. For example, we noted that the energy company "may have a statutory right to enter" portions of the private property so long as it complied with all statutory requirements. *Id.* ¶ 29. Other alternatives we noted were "securing the written consent or waiver" of the property owner and posting a bond. *Id.* (citation omitted). Of course, none of these alternatives was the equivalent of condemnation; none offered equivalent control and, perhaps more crucially, none guaranteed access—indeed, at least one of the alternatives we listed would have required the energy company to appeal to the absolute discretion of

the landowner. We nevertheless concluded, "Because [the company] has alternative avenues of access to its leased mineral rights, we do not believe that it would be absurd to interpret . . . the phrase 'mineral deposits' as not encompassing oil and gas." *Id.* ¶ 30.

¶ 60 Similarly here, reading section 201 and its predecessor according to their plain meaning may well leave the State with no *direct judicial* means to quiet title, but the State does have an alternative *administrative* means under the Federal Land Policy and Management Act to establish or renew its rights of way. Before the passage of FLPMA in 1976, "Congress had enacted a tangled array of laws granting rights-of-way across federal lands. In an effort to untangle these laws and establish a statutory scheme for the management of forest lands, Congress passed the Federal Land Policy and Management Act." *United States v. Jenks*, 22 F.3d 1513, 1515–16 (10th Cir. 1994) (citation omitted). "Title V of FLPMA repealed over thirty statutes granting rights-of-way across federal lands and vested the Secretaries of Agriculture and Interior with authority 'to grant, issue, or renew rights of way over [Forest Service and public lands] for . . . roads, trails [and] highways' . . . subject to reasonable regulation." *Id.* (alterations and first omission in original) (citations omitted).

¶ 61 Subchapter V of FLPMA authorizes the federal government to grant, issue, or renew rights of way over public lands for reservoirs, pipelines, roads, trails, highways, livestock driveways, and other systems or facilities that are in the public interest and that require rights of way over such lands. 43 U.S.C. § 1761(a) (2010). In designating right-of-way corridors under FLPMA, the relevant agency must "take into consideration national and State land use policies, environmental quality, economic efficiency, national security, safety, and good engineering and technological practices." 43 U.S.C. § 1763 (2013). One commentator estimates that the "BLM has granted thousands of routes under this formal process." Tova Wolking, *From Blazing Trails to Building Highways: SUWA v. BLM & Ancient Easements over Federal Public Lands*, 34 ECOLOGY L.Q. 1067, 1101 (2007).

¶ 62 And of course, if a claimant "disagrees with the agency's decision, it may appeal or seek judicial review." *United States v. Garfield County*, 122 F. Supp. 2d 1201, 1244 (D. Utah 2000). "The court may then review the agency's initial determination in accordance with the provisions of the Administrative Procedure Act." *Id. See, e.g., Southern Utah Wilderness All.*, 425 F.3d at 747, (stating that the initial determination of whether activity falls within an established right-of-way must be made by the agency and not the court).

¶ 63 This administrative approach is not so overwhelmingly absurd that no rational legislator could prefer it to litigating hundreds of historic R.S. 2477 claims that depend on memories of events that occurred half a century or more earlier. *See, e.g.*, *San Juan County v. United States*, No. 2:04-CV-0552BSJ, 2011 WL 2144762, at *23 (D. Utah May 27, 2011) (stating that a witness testified "that he first traveled through Salt Creek Canyon in the spring of 1943, working with his father as a cowboy . . . for $25 a month" and another testified "that he began herding cattle . . . in Salt Creek Canyon on horseback beginning in 1956"), *aff'd*, 754 F.3d 787 (10th Cir. 2014). A statutory approach that would bar the State from litigating titles to each of the claimed rights of way and instead would require the State to pursue uncertain administrative remedies or simply leave some or all of the title disputes unresolved may strike some judges as unwise or incongruous. But "[i]f we are to maintain respect for the legislature's policymaking role, and avoid the temptation to substitute our preferences for its decisions, we must not override the statutory text with our sense of good policy in a case in which we deem the statute's formulation merely unwise or incongruous." *Cox v. Laycock*, 2015 UT 20, ¶ 72, 345 P.3d 689 (Lee, J., concurring in part).

¶ 64 In sum, as in *Marion Energy*, the availability of an alternative avenue for the State to enjoy its claimed rights of way over federal land shows that applying section 201 and its predecessor according to their plain meaning does not work an absurd result here.[82]

### D. The 2015 Amendments Do Not Apply.

¶ 65 The State contends that two 2015 amendments to Title 78B "compel the conclusion that the statute is one of limitations, not repose."[83]

_____

[82] Like the fact that federal sovereign immunity barred Utah's title claims against the United States from the Mexican Cession until the passage of the Quiet Title Act, the availability of a federal administrative remedy distinguishes these claims against the federal government from all other claims to which section 201 might hypothetically apply.

[83] Because the majority opinion reforms section 201 as a statute of limitations, it does not need to consider the State's alternative argument for reading that section as a statute of limitations. But because I read section 201 as a statute of repose, I must explain why the State's alternative argument fails.

Judge Voros, dissenting

¶ 66 House Bill 401 created a new section 78B-2-118. The new section addresses actions against only one party, the federal government. It provides that suits against the federal government under the Quiet Title Act never expire:

> Actions against the federal government regarding real property and that are subject to the federal Quiet Title Act, 28 U.S.C. Sec. 2409a, do not expire under this chapter.

UTAH CODE § 78B-2-118 (2015). The legislation specifies, "This bill has retrospective operation to October 25, 1972." 2015 Utah Laws 324.

¶ 67 House Bill 1001 renumbered the existing section 201 as subsection 201(1) and added a new subsection (2). The new subsection (2) describes the new subsection (1) (the old section 201) as a "statute of limitations":

> The statute of limitations in this section runs from the date on which the state or those from whom it claims received actual notice of the facts giving rise to the action.

UTAH CODE § 78B-2-201(2). The legislation specified, "This bill has retrospective operation to March 12, 1953." 2015 Utah Laws 1st Spec. Sess. 2806.

¶ 68 SUWA sees "three fatal flaws" in the State's argument based on the 2015 amendments. First, SUWA argues, application of these amendments would impair existing rights by reviving time-barred claims. Second, it argues, the Supremacy Clause of the United States Constitution prohibits state laws that discriminate against the United States. And third, SUWA argues, "the Utah Legislature is constitutionally prohibited from 'attempt[ing] to determine the outcome of a particular case by passage of a law intended to accomplish such a purpose.'" (Quoting *Foil v. Ballinger*, 601 P.2d 144, 151 (Utah 1979)).

¶ 69 The timing and text of the bills reveal that the amendments were aimed at pending R.S. 2477 litigation. This conclusion is reinforced by the floor debate on House Bill 1001.[84] The sponsor of

---

[84] In contrast to House Bill 1001, House Bill 401 passed both houses of the Legislature without floor debate. *See* Utah House Floor Debates, H.B. 401, 61st Leg., 2015 Gen. Sess. (Mar. 5, 2015), http://utahlegislature.granicus.com/MediaPlayer.

(Continued)

House Bill 1001 cited the certification question now pending before this court, stating that three federal judges "certified this to come to the . . . Supreme Court of the State of Utah and ask for clarification on this law." The sponsor further stated, "If the assertion is correct by SUWA then these cases would all be barred." The amendment, the sponsor explained, "only affects one particular action."[85] And although a senator during floor debate questioned whether it was wise to "have the legislature jump into a current court case," no one questioned the premise of his question.[86] Indeed, in its briefing the State acknowledges that "section 78B-2-201 continues to apply to claims by the State with respect to a right or interest in real property in all other contexts *except* the one presented in these cases."

¶ 70 These amendments do not alter my analysis of the character of section 201 and its predecessor, because applying the 2015 amendments to the present litigation would impair vested rights while impermissibly allowing the Legislature to determine the outcome of a particular case.

¶ 71 "A provision of the Utah Code is not retroactive, unless the provision is expressly declared to be retroactive." UTAH CODE § 68-3-3 (2010). Even then, other limits may apply. One such limit precludes retroactive amendments that would impair vested rights.

¶ 72 "We have often stated that retroactive application is permissible if the amended version of the statute '[does] not enlarge, eliminate, or destroy vested or contractual rights.'" *Harvey v. Cedar Hills City*, 2010 UT 12, ¶ 14, 227 P.3d 256 (alteration in original) (quoting *Dep't of Soc. Servs. v. Higgs*, 656 P.2d 998, 1000 (Utah 1982)). A statute-of-limitations or statute-of-repose defense vests when the

---

php?clip_id=18757&meta_id=548111 [https://perma.cc/5K7E-VX4H]; Utah Senate Floor Debates, H.B. 401, 61st Leg., 2015 Gen. Sess. (Mar. 12, 2015), http://utahlegislature. granicus.com/MediaPlayer.php?clip_id=18898&meta_id=552758 [https://perma.cc/H6Z2-98F5].

[85] Utah House Floor Debates, H.B. 1001, 61st Leg., 2015 1st Spec. Sess. (Aug. 19, 2015) (statements of Rep. Michael E. Noel), http://utahlegislature.granicus.com/MediaPlayer.php?clip_id= 19095&meta_id=560947 [https://perma.cc/SFY8-M6GR].

[86] Utah Senate Floor Debates, H.B. 1001, 61st Leg., 2015 1st Spec. Sess. (Aug. 19, 2015) (statements of Sen. Jim Dabakis), http://utahlegislature.granicus.com/MediaPlayer.php?clip_id= 19094&meta_id=560932 [https://perma.cc/P6WC-HPTP]

statutory period expires. "Since 1900, this court has consistently maintained that the defense of an expired statute of limitations is a vested right." *Roark v. Crabtree*, 893 P.2d 1058, 1062 (Utah 1995). Thus, "once a party acquire[s] a defense based upon an expired statute of limitations, that defense [can] not be impaired or affected by subsequent legislation extending the limitation period." *Id. See also Stein v. Regions Morgan Keegan Select High Income Fund, Inc.*, 821 F.3d 780, 794 (6th Cir. 2016) (stating that "statutes of repose vest a substantive right in defendants to be free of liability" (citing *CTS Corp. v. Waldburger*, 134 S. Ct. 2175, 2183 (2014))). The federal government acquired its statute-of-repose defense, if at all, well before 2015. Accordingly, the 2015 amendments cannot be read to impair or affect that defense.[87]

¶ 73 Granting the 2015 amendments retroactive application in this context would also allow the Legislature to choose winners and losers in particular pending cases. Of course, the Legislature may by statutory amendment overrule our interpretation of statutes. *See Foil*, 601 P.2d at 150 (finding it "indisputable that the Legislature intended to overrule" an earlier decision of this court). However, in *Foil* we recognized "the potential mischief, indeed, the grave constitutional problems, that could arise if the Legislature were to attempt to determine the outcome of a particular case by passage of a law intended to accomplish such a purpose." *Id.* at 151. *See also Carter v. Lehi City*, 2012 UT 2, ¶¶ 36–43, 269 P.3d 141 (discussing the constitutional prohibition against special legislation). The legislative role does not include picking "winners and losers in particular pending cases." *See Bank Markazi v. Peterson*, 136 S.Ct. 1310, 1338 (2016) (Roberts, C.J., dissenting).[88]

¶ 74 For these reasons, the 2015 amendments do not alter my conclusion that section 201 and its predecessor are statutes of repose.

---

[87] Any claim that the amendments merely clarified the intent of the Territorial Legislature of 1872 lacks support in both fact and law. *See, e.g.*, *State v. Perez*, 2015 UT 13, ¶ 9, 345 P.3d 1150 (stating that our recent cases expressly repudiate an exception to the rule against retroactivity for clarifying amendments).

[88] Indeed, if the State's argument prevailed, the Legislature could control every stage of the pending litigation against the federal government by periodically amending any relevant state statute or rule and declaring the amendment to have retroactive effect.

Judge Voros, dissenting

## II. The Federal Government Is a Person For Purposes of Section 201

¶ 75 The State argues that the federal government may not invoke section 201, because the federal government does not qualify as a "person" under that section. The majority concludes that this question can be fairly said to be included within the scope of the certified question. *Supra* ¶ 12 n.25. "It has been the consistent practice of this court to decline to address issues that are not presented or fairly included in the question or questions that we have accepted for review." *Miller v. United States*, 2004 UT 96, ¶ 27, 104 P.3d 1202 (Durrant, J., concurring in part and dissenting in part).

¶ 76 It is not obvious to me that the question of whether section 201 is a statute of repose or a statute of limitations fairly includes the question of whether the federal government qualifies as a "person" for purposes of section 201. But assuming that the question of the personhood of the federal government is before us, it can in my judgment be readily resolved by reading the statutory text. "Courts are bound by the plain language of the statute." *Aris Vision Inst., Inc. v. Wasatch Prop. Mgmt., Inc.*, 2006 UT 45, ¶ 17, 143 P.3d 278, *reh'g denied*. "Accordingly, it is only 'when statutory language is ambiguous—in that its terms remain susceptible to two or more reasonable interpretations after we have conducted a plain language analysis'—that we 'resort to other modes of statutory construction,' such as legislative history." *Penunuri v. Sundance Partners, Ltd.*, 2013 UT 22, ¶ 16, 301 P.3d 984 (citation omitted). In sum, "our analysis begins with the text of the statute and, if that text is unambiguous, ends there." *State v. Rasabout*, 2013 UT App 71, ¶ 28, 299 P.3d 625, *aff'd*, 2015 UT 72, 356 P.3d 1258.

¶ 77 The relevant statute here is Utah Code section 68-3-12.5. I agree with the majority that, given that the events in this case took place before 2010, the pre-2010 versions of the definitions statute appear to control, and that they all define "person" to include "bodies politic." *See* Revised Statutes of 1898 § 2498(5); UTAH CODE § 68-3-12(2)(o). *Supra* ¶ 12 n.25.[89]

---

[89] Though probably inapplicable here, the 2010 version of the statute defines *person* to include both a "body of government" and "any other organization or entity." UTAH CODE § 68-3-12.5(14). The federal government is unquestionably a "body of government." *See, e.g., Cogger v. County of Becker*, 690 N.W.2d 739, 742 (Minn. 2005) (referring to "the federal government as the sole body of government

(Continued)

¶ 78 Ample authority demonstrates that the federal government falls within the generally accepted definition of *body politic* at all relevant times. *See, e.g.*, *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 688 n.51 (1978) ("The United States is a government, and, consequently, a body politic and corporate." (quoting *United States v. Maurice*, 26 Fed. Cas. 1211, 1216 (C.C.D. Va. 1823) (No. 15,747))); *Van Brocklin v. Tennessee*, 117 U.S. 151, 154 (1886) (same); *Cotton v. United States*, 52 U.S. 229, 231 (1850) ("Although as a sovereign the United States may not be sued, yet as a corporation or body politic they may bring suits to enforce their contracts and protect their property, in the State courts, or in their own tribunals administering the same laws."); *Body Politic*, BLACK'S LAW DICTIONARY 143 (1st ed. 1891) ("[B]ody politic": "It is often used, in a rather loose way, to designate the state or nation or sovereign power, or the government of a county or municipality, without distinctly connoting any express and individual corporate charter").

¶ 79 Because the federal government is a body politic, it falls comfortably within the statute's definition of *person*.[90]

\* \* \*

---

authorized to interact with" Native Americans). The federal government is also an entity. Indeed, in discussing public lands within improvement districts, another Utah statute cites the federal government as its first example of an entity: "Fee lands and property of *public entities such as the federal government . . . .*" UTAH CODE § 54-8-5(8) (emphasis added). Accordingly, under the 2010 version of section 12.5, the United States indisputably qualifies as a person.

[90] In my judgment, the term *body politic* unambiguously encompasses the federal government. But even if the definitional section could plausibly be read—as the State urges—to grant the State greater rights under section 201 against the federal government than against other defendants, such a reading would risk running afoul of the Supremacy Clause. The Supremacy Clause forbids states to discriminate against the United States. *See Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*, 361 U.S. 376, 387 (1960). The canon of constitutional avoidance holds that we may "reject[] one of two plausible constructions of a statute on the ground that it would raise grave doubts as to its constitutionality." *Utah Dep't of Transp. v. Carlson*, 2014 UT 24, ¶ 23, 332 P.3d 900. Accordingly, even if the State's reading were plausible, I would reject it under this canon.

Judge Voros, dissenting

¶ 80 We have been asked to read a statute. We should, in my judgment, stop "straining to avoid its natural meaning," *see Kungys v. United States*, 485 U.S. 759, 781 (1988). All members of this court agree that the text of section 201 unambiguously describes a statute of repose. No member of this court disputes that the result mandated by that statute of repose was the prevailing rule of law throughout the United States for over a century. I am thus at a loss to understand how we can label that result overwhelmingly absurd, especially when the State now has alternative remedies available to it under federal law.

¶ 81 I thus respectfully dissent.

––––––––––––